IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DELRESA A. MYERS, | ) | 4:05CV3219 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| MICHAEL HALBLEIB, in his | ) | |
| individual and official capacities, | ) | |
| ANGELA BAKER, in her individual | ) | |
| and official capacities, and | ) | |
| ANTHONY DeSANTI, in his official | ) | |
| and individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

This civil rights action is brought pursuant to 42 U.S.C. § 1983. The plaintiff, Delresa A. Myers ("Myers") seeks monetary relief for a warrantless search of her home. The defendants are three Omaha Police Department officers, each sued in their individual and official capacities: Michael Halbleib, Angela Baker, and Anthony DeSanti. A mother had reported that her juvenile daughter was missing and feared she had been abducted by her boyfriend–Myers' son Dwayne. The defendants sought to search Myers' home to determine whether Dwayne or the missing girl were present. Myers consented to the search, but asserts that her consent was involuntary.

This matter is before the court upon cross-motions for summary judgment on the merits. The parties agree that the issues are whether Myers' consent was valid and whether the exigent circumstances exception to the warrant requirement applies. I will deny the motions for summary judgment on the question whether Myers' consent was valid, as material facts regarding the voluntariness of the consent are in dispute. I will grant Plaintiff's motion on the question whether exigent circumstances excused the warrantless search.

## I. BACKGROUND

I first explain why I consider the motions for summary judgment on the merits but do not consider qualified immunity. By prior order of the court, the deadline for filing motions for summary judgment based on qualified immunity was August 2, 2006 and the deadline for filing motions for summary judgment on the merits was February 16, 2007. (Filing 29.) On February 14, 2007, the plaintiff filed a motion for summary judgment on the merits. In response, and on March 9, 2007, Defendants sought leave to file a motion for summary judgment based both on the merits and on the ground of qualified immunity. (Filing 48.) The Magistrate Judge denied leave to file a motion based on qualified immunity, but granted leave to file a motion on the merits. (Filing 52.) Though the defendants did not appeal this order, the briefs [1] of both parties touch on the issue of qualified immunity. (Filing 47 at 10-21, Filing 51 at 2-7.) However, those briefs do not address the extremely difficult legal question of how to resolve the issue of qualified immunity as to the voluntariness of the consent when there is clearly a factual issue as to voluntariness. Under these circumstances, I do not consider qualified immunity.

---

[1] There are many briefs before the court, and I cite them solely by filing number:

filing 40     P's Br. in Supp. of Mot. for Summ. J.;
filing 47     Defs.' Br. in Resp. to P.'s Mot. for Summ. J. and in Supp. of Defs.' Cross Mot. for Summ. J.;
filing 51     P.'s Reply Br. in Supp. of Mot. for Summ. J and in Opp'n to Defs.' Untimely Mot. for Summ. J.;
filing 55     Defs.' Br. in Supp. of Defs.' Mot. for Summ. J.;
filing 56     P.'s Br. in Opp'n to Defs.' Mot. for Summ. J.

## Undisputed Material Facts

The undisputed material facts are set forth below. Defendants rely on the same evidence Plaintiff submitted in support of her motion for summary judgment.[2]

1.    In the early morning of March 12, 2005, Officer Anthony DeSanti was dispatched to the home of Angelina Perry after a 911 call about a missing juvenile. (DeSanti Dep. 18:13-19.) Angelina's mother had called 911, concerned that Angelina had not returned home after school and wanted to file a missing juvenile report. (Id. 16:23-24.)

2.    Dwayne and Angelina were about the same age and had been dating for about year before the incident on March 12, 2005. (Myers Dep. 36:18-25.) Dwayne had allegedly gone to Angelina's school three to five days earlier and threatened Angelina. (DeSanti Dep. 19:13-17.) DeSanti was not told specifically what the threat had been about, just that the threat had been made. (Id. 20:7-13.)

3.    When Officer DeSanti responded to the call to investigate the missing girl, he spent about 30 minutes interviewing Angelina's mother and obtained information that corroborated Angelina's mother's fears. DeSanti was told that Angelina was very responsible and would always call and inform her mother of her activities. Angelina had been seen at school and her failure to return home without

---

[2]All evidence before me is found at filing 41. It includes the following:
Ex. 1, Myers Dep., found in filings 41-2 and 41-3 and cited as "Myers Dep.";
Ex. 2, Halbleib Dep., found in filings 41-4 and 41-5 and cited as "Halbleib Dep.";
Ex. 3, DeSanti Dep., found in filing 41-6 and cited as "DeSanti Dep.";
Ex. 4, Baker Dep., found in filing 41-7 and cited as "Baker Dep.";
Ex. 5, DVD recording made by Myers, referenced in filing 41-8 and original
      maintained in the office of the Clerk of Court, cited as "DVD Recording";
Ex. 6, transcript of DVD recording, found in filing 41-9 and cited as "DVD Tr.".

calling was uncharacteristic. DeSanti understood the threat that Dwayne Myers made against Angelina few days before to be about a breakup in the relationship and that it implied a threat against Angelina's safety or health and a threat to hold her against her will. He understood Angelina's mother to be expressing concern that her daughter was in impending danger. (DeSanti Dep. 60:11-61:5.)

    4.    DeSanti relayed to Officer Michael Halbleib, a detective in the Criminal Investigations Bureau, that Angelina Perry's mother believed her daughter was being held against her will, and that Dwayne had earlier gone to Angelina's school and threatened her. (DeSanti Dep. 23:12-14, 21-23.) This call was shortly after 5 a.m. (Halbleib Dep. 22:10-12.) The only evidence that the officers had which indicated Angelina's safety was in imminent danger was her mother's belief that Angelina has been abducted. (DeSanti Dep. 26:7-11.)

    5.    Using Dwayne's known phone number, dispatch came up with the address for Delresa Myers' house. (DeSanti Dep. 26:23-27:4.) DeSanti and Halbleib went to the home. (Id. 27: 5-7.)

    6.    Myers heard a knock on her door in the early morning and, looking out the window, saw the police were at her home. (Myers Dep. 40:13-41:7.) It was between 6:00 and 6:30 a.m. (Id. 40:13-16.) Myers went to her front door and opened both the inside door and the outside door. Two male police officers (Halbleib and DeSanti) were there. Halbleib asked Myers if Dwayne Myers was at the home. (Id. 45:3-18.) Myers stated that Dwayne was not there and was concerned that something was wrong with her son. (Id. 45:18-20.) Dwayne was staying at his mother's home for a week after completing basic training with the Navy, but he was not present when Defendants arrived. (Id. 35:6-13, 45:18.) Halbleib asked if the officers could come into the house and Myers said "yes." (Id. 45:20-22.)

7. Halbleib and DeSanti entered the front room/dining room and never went into any other area of the house. (Id. 103:8-104:11.) Halbleib asked again if Dwayne was home, and if Angelina Perry was in the house; Myers answered that neither was in her home. (Id. 45:22-25.) Halbleib and DeSanti told Myers that Angelina had been reported missing. (Id. 59:3-4.)

8. Halbleib stated that he needed to search Myers' home for Angelina. (Myers Dep. 57:24-58:1.) Myers stated again that Angelina was not in her home and that she did not want the officers to search. (Id. 60:2-8.) She did not want the officers to search her home because she believed it was her right to refuse. (Id. 64:10-17.)

9. The officers spoke to Myers for several minutes and she did not cooperate with the investigation into the girl's disappearance. (Halbleib Dep. 29:22-30:3.) She refused to answer questions regarding her son's name, basic information, and the vehicle he might be driving. (Baker Dep. 11:21-12:23.)

10. Halbleib told Myers that she would be arrested if she did not allow Defendants to search the home. (Myers Dep. 65:24-66:2.) Myers asked if the officers had a search warrant, and was told by Halbleib that if he had to go get a warrant, she would be arrested. (Id. 75:14-17.) Halbleib directed DeSanti to arrest Myers. (Id. 66:2-3, Halbleib Dep. 33:19-22.)

11. Myers' daughter, who was in the room, tried to help her mother and told the officer that Myers had just had surgery. (Halbleib Dep. 46:15-24.) At that point, Halbleib decided to try and calm Myers, instead of arresting her, to avoid a medical emergency. (Id. 46:25-47:6.)

12. Halbleib believed that exigent circumstances existed that would allow a brief search of the house; that is, a missing juvenile was in imminent danger.

(Halbleib Dep. 32:9-21.)  Although Halbleib did not believe he needed consent to search, he stated that he continued to attempt to obtain Myers' consent to search as a courtesy and way to avoid conflict and be civil.  (Id. 82:22-25.)  He sought to calm her down and get her to understand the urgency of the circumstances.  (Id. 32:5-33:1.)

13.   During his encounter with Myers, Halbleib was reminded of a similar case that had unfolded in Omaha shortly before this time.  A young woman named Joanne Lofton had been reported missing and was later found murdered.  The case involved suggestions that a boyfriend had abducted Lofton and committed the murder.  Because the circumstances were very similar, Halbleib feared that a similar fate awaited Angelina Perry.  (Halbleib Dep. 23:4-22; 94:18-95:24.)  DeSanti was also aware of the Lofton case and its similarities in that police had information that Lofton had been threatened by the boyfriend before her disappearance.  DeSanti shared Halbleib's concern that a similar abduction and threat of immediate harm was being repeated.  (DeSanti Dep. 61:7-62:13.)

14.   Myers left the living room and returned with a video camera and began recording her conversation with the officers.  (Myers Dep. 85:1-3.)  The officers did not attempt to prevent her from leaving the room to get the video camera, nor did they attempt to prevent her from using it.  (Id. 87:1-5, 89:25-90:9.)  Myers felt she was "free to move about the house. " (Id. 86:8.)  About fifteen minutes had passed from the time when Defendants arrived at the house until the time Myers began recording with the video camera.  (DeSanti Dep. 27:21-25.)  Once the video camera was recording, Myers again stated that Dwayne Meyers was not in the residence and that the officers had tried to arrest her.  (DVD Tr. 2:15-21.)  Halbleib denied the arrest attempt. (Id. 2:23-3:5.)

15.   Myers continued to state that Defendants attempted to arrest her.  (DVD Tr. 3:22-4:13.)  Halbleib asked if he needed to get a search warrant. (Id. 4:14-19.) This response followed:

> *Myers:* You're tellin' me that if I don't let you guys search my house I'm gonna be arrested?
>
> *Halbleib:* Absolutely, yes.

(Id. 4:20-24.)

16. Baker was present during the above-quoted exchange. Baker understood Halbleib to be speaking of arresting Myers not for her refusal to give consent to search the house but, instead, for Myers' overall refusal to assist in the investigation of the missing girl. (Baker Dep. 18:1-19:25.)

17. Throughout her encounter with Defendants, Myers talked to her brother and sister on the phone. (Myers Dep. 97:7-15.) At some point during the encounter, Officer Angela Baker had joined DeSanti and Halbleib at the house, and Halbleib suggested to Myers that Baker go look around the house. (DVD Tr. 6:21-23.) Halbleib stated that if Baker searched, there would be no problems, no arrest, and the officers would leave. (DVD Tr. 6:21-7:3.)

18. Myers eventually told Baker to go look through the house. (DVD Tr. 9:17-22.) Baker performed a cursory search of the home and did not find Dwayne. (Baker Dep. 15:11-14, 27:3-5.)

19. Halbleib and DeSanti understood that Myers eventually did voluntarily consent to an officer walking through the house. (Halbleib Dep. 30:12-14; DeSanti Dep. 68:20-70:14.) Although Myers initially refused to allow the two male officers to walk through the house, she did allow Officer Baker, a black female officer, to walk through the house. (Myers Dep. 105: 4-7.) Myers told Baker, in the presence of Halbleib and DeSanti, "You go look, go look" and "You go through the house." (Myers Dep. 101:8-23; DVD Tr. 9:17-19; DeSanti Dep. 70:6-14.) Halbleib then told her "Thank you"(DVD Tr. 9:22) and Myers explained to Halbleib: "I'm lettin' you –

this young woman right here look through my house." (Myers Dep. 101:8-102:10; DVD Tr. 10:7-9.) Myers even suggested other rooms that Baker should look into. (Myers Dep. 107:3-17; Baker Dep. 16:18-17:6.)

20.     Baker understood that Myers was giving Baker permission to walk through the house and that the permission was given voluntarily. (Baker Dep. 17:23-25.) This permission was given in the presence of the other two officers. Baker walked through the rooms looking for the two young people. (Id. 12:25-13:9; 14:1-17.) Baker felt the permission was voluntarily given because Myers appeared calm in talking to Baker and Myers seemed to believe Baker "was okay." (Baker Dep. 14:18-15:8.) Myers, an African-American, concedes that she felt more comfortable allowing Officer Baker access to the house because Baker was an African-American female who spoke calmly and courteously to Myers. (Myers Dep. 120:1-6; 121:1-122:1.) Baker stated that it appeared to her that Myers was not in fear of police and was not in fear of being arrested. (Baker Dep. 23:11-24.)

21.     After the search Defendants asked for Dwayne's personal information such as birth date and description of his vehicle. (DVD Tr. 19:4-20:8.) Myers asked for and was given the names and badge numbers of Defendants. (Myers Dep. 111:17-112:6.)

22.     DeSanti and Halbleib left the home. (Baker Dep. 20:10-11.) Baker went outside the home and spoke to Sergeant Higgins, who had arrived on the scene. (Id. 20:13-14.) Myers came outside and told Baker that Dwayne was on the phone. (Id. 21:23-22:3.) Baker talked to Dwayne and was told that he was at a hotel. (Id. 22:4-7.)

23.     Baker, Higgins, and DeSanti went to the hotel and found Dwayne with Angelina Perry. (Baker Dep. 22:8-15.) The officers were advised that Angelina was with Dwayne Myers of her own accord, and Baker took Angelina home. (Baker Dep. 22:15-23:4.)

24.     It was recommended that Halbleib be disciplined for violating Omaha Police Department Standard Operating Procedure, Volume II, Section S, Searches of Residence and Warrantless Non-Consensual Entry. (Halbleib Dep. 59:3-8, 61:12-18.) He was issued a written reprimand and appealed; there was no final disposition on the appeal due to time issues. Because of procedural defects in the appeal of the discipline, the written reprimand never became part of Halbleib's disciplinary file. (Id. 61:22-62:22.)

## II.  ANALYSIS

### Standard of Review

Summary judgment on the merits should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Egan v. Wells Fargo Alarm Servs., 23 F.3d 1444, 1446 (8th Cir. 1994). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999). In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." Id. Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

### Warrantless Searches

A search "conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (internal citations omitted). One of those exceptions is a search conducted pursuant to consent. Id. Another is a search undertaken with probable cause under exigent circumstances. Anderson v. Creighton, 483 U.S. 635, 641 (1987). The issues before me on summary judgment are whether either of these exceptions apply. I consider them in turn.

**Validity of Consent**

This is an unusual case. Fifteen minutes after Myers permitted the officers to enter her home, and after the officers had several times attempted to obtain Myers' consent to search the home, Myers made a video recording of her interaction with Defendants and that video recording is in evidence before the court. The video reflects that *when Myers asked "[A]re you tellin' me . . . that if I don't let you guys search my house I'm gonna be arrested," Halbleib replied "[a]bsolutely, yes."* (DVD Tr. 4:16-24 (emphasis added).) Later, Myers gave permission for Baker to search her home. Obviously, the voluntariness of this consent is at issue. "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227. Consent may not be coerced by implied threat or covert force, id. at 228, and certainly not by direct threats or force.

Myers contends that her consent was involuntary because she understood Officer Halbleib to have threatened her with arrest if she refused consent to search, she was physically intimidated when Officer DeSanti tried to handcuff her, and because the officers continued to request consent to search despite her repeated refusals.[3] (Filing 40 at 13.) Defendants assert that although Halbleib said

---

[3]I do not understand Plaintiff to challenge the entry of the officers into her home, nor do I understand Plaintiff to assert that she withdrew her initial consent to enter her home. Defendants' brief in support of their motion for summary judgment asserts that "Myers does not challenging [sic] Halbleib's and DeSanti's entry into the home because she concedes she opened the door and invited the officers into her residence. What she is challenging is the subsequent walk-through search of her home." (Filing 55 at 16.) Plaintiff's brief in opposition to Defendants' motion does not dispute this statement. (Filing 56.) However, during her deposition, Myers stated that before Baker arrived, and about the time that Halbleib directed DeSanti to arrest her, she "rescinded" her invitation for the officers to enter her home and "wanted them out." (Myers Dep. 64:2-4.) The material facts submitted by the parties do not

"absolutely, yes" when Myers asked if she would be arrested if she refused consent, Halbleib threatened arrest *not* because Myers refused consent to search but because Myers' refusal to answer questions obstructed the investigation into the search for the missing girl. (Filing 55 at 5, 19.) Thus the ultimate question of fact–voluntariness of consent–is in dispute. In addition, there is a dispute as to a key underlying fact: whether DeSanti or Halbleib touched Myers in an attempt to handcuff her and whether she was handcuffed. (Myers Dep. 66:4-5 (DeSanti grabbed her and tried to put her in handcuffs); DeSanti Dep. 35:8-20 (DeSanti got his handcuffs out, but none of the officers "put their hands on Ms. Myers").) Because there is clearly a factual dispute as to the voluntariness of consent, I cannot grant summary judgment on this issue.

Defendants assert that any liability for an unlawful search should be limited to Baker, as it is undisputed that she was the only officer who searched Myers' home. Myers alleges that each of the officers is liable to her, as Officers Halbleib and DeSanti used coercive tactics to obtain her consent to search, DeSanti placed her hands behind her back in preparation for handcuffing her, Baker conducted the search, and the three officers "worked together as a unit in pressuring her to consent to a search." (Filing 51 at 8.) The question of which officers are potentially liable for the search (assuming that it was unlawful) is inextricably tied to the factual dispute regarding voluntariness of Myers' consent, and cannot be decided on summary judgment.

### Exigent Circumstances

Warrantless searches of a home are "'presumptively unreasonable.'" Brigham City, Utah v. Stuart, 126 S. Ct. 1943, 1947 (2006) (internal citations omitted). However, exigent circumstances are a recognized exception to the warrant

---

address whether Myers communicated that recision.

requirement. Mincey v. Arizona, 437 U.S. 385, 394 (1978) (citing cases). "A warrantless search is reasonable when justified by both probable cause and exigent circumstances." United States v. Parris, 17 F.3d 227, 229 (8th Cir.), cert. denied, 511 U.S. 1077 (1994). The fighting issue here is whether exigent circumstances were present.

The historical facts leading up to a warrantless search are determined by the factfinder. United States v. Ball, 90 F.3d 260, 262 (8th Cir. 1996) (citing Ornelas v. United States, 517 U.S. 690 (1996)). Whether these historical facts created exigent circumstances is a question of law for the court. Doran v. Eckold, 409 F.3d 958, 961-62 (8th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005). The subjective motivations of the officers who searched are irrelevant. Brigham City, 126 S. Ct. at 1948 ("The officer's subjective motivation [for a warrantless search] is irrelevant."). The standard is an objective one: could an "objectively reasonable officer on the scene" have believed that exigent circumstances justified a warrantless entry. United States v. Leveringston, 397 F.3d 1112, 1116 (8th Cir.), cert. denied, 126 S. Ct. 159 (2005).

There is no exhaustive list of exigent circumstances. Exigent circumstances are "typically limited to situations where a life is threatened, a suspect's escape is imminent, or evidence is about to be destroyed . . . ." Radloff v. City of Oelwein, 380 F.3d 344, 348 (8th Cir. 2004) (citing Ball, 90 F.3d at 263). They may also be found "when there is a compelling need for official action and there is no time to secure a warrant." Id. (citing Michigan v. Tyler, 436 U.S. 499, 509 (1978).) The need to assist persons who are seriously injured or threatened with serious injury is an exigent circumstance, and accordingly "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Brigham City, 126 S. Ct. at 1947. Additionally, "[a] legitimate concern for officer safety or the safety of others may constitute an exigent circumstance, and a warrantless entry into a residence may be justified if an

officer has a reasonable fear of harm." United States v. Poe, 462 F.3d 997, 999 (8th Cir. 2006) (citing United States v. Hill, 430 F.3d 939, 941 (8th Cir. 2005)).

I review the salient undisputed facts. In the early morning, and before 4:30 a.m.[4] on March 12, 2005, Angelina Perry's mother called 911 and reported her daughter missing. Officer DeSanti went to Angelina's home and talked to her mother for about thirty minutes. Angelina's mother said that three to five days earlier, Angelina's boyfriend Dwayne Myers had threatened Angelina at school. The nature of the threat was unspecified. Angelina's mother stated that Angelina had not returned home from school and feared that Angelina was being held against her will. It is undisputed that the only evidence that Angelina was in imminent danger was her mother's belief that she had been abducted. DeSanti relayed this information to Halbleib at approximately 5:00 a.m. The officers obtained Dwayne's telephone number, and dispatch advised them that the telephone customer with that number lived at a particular address–which later proved to be Myers' home. DeSanti and Halbleib went to that address. Myers recalls that they arrived between 6:00 and 6:30 a.m. They asked if Dwayne was in the home, and Myers indicated he was her son and was not then present in her house, though he was staying there at the time. DeSanti and Halbleib were later joined by Officer Baker. For approximately fifteen minutes, the officers repeatedly requested consent to search the residence for Dwayne or Angelina and were denied. They asked Myers other questions about Dwayne in an attempt to locate Angelina and Myers was uncooperative. Myers finally gave Baker permission to search. This permission was given at approximately 6:15 or 6:30 a.m. At least one hour and forty-five minutes had elapsed since Angelina's mother called 911 to report her missing.

---

[4] The facts show that DeSanti spent thirty minutes talking to Angelina's mother before calling Halbleib and called Halbleib shortly after 5:00 a.m. Thus the 911 call could not have been made later than 4:30 a.m.

-14-

Dwayne's unspecified threat to Angelina at school, three to five days before she was reported missing, together with the fear of Angelina's mother than Angelina was being held against her will, do not constitute exigent circumstances. Dwayne's threat was vague and unspecified, and there is no certainty that it was a threat of physical harm. The only evidence that Angelina was in imminent danger was her mother's belief that she had been abducted. No one saw Dwayne harming Angelina. There was no evidence that Angelina was with Dwayne, and no evidence that Dwayne or Angelina were in Myers' home. Myers told the officers that neither Dwayne or Angelina were there. These undisputed facts show that there are no exigent circumstances. This is so even considering the fact that DeSanti and Halbleib were aware that shortly before Angelina's mother reported her missing, another young woman in the same city was reportedly abducted and murdered by her boyfriend after prior threats from the boyfriend (the Lofton case).

An objectively reasonable police officer who knew what Defendants knew could not have believed that Angelina's life was threatened, that imminent harm was threatened, or that there was an emergency causing a "compelling need for official action and no time to secure a warrant." Radloff, 380 F.3d at 348. The fact that DeSanti and Halbleib took over fifteen minutes to attempt to get Myers' consent is an indication that reasonably objective officers would have concluded that no exigent circumstances were present and a warrant or consent was needed before they could search. At least one hour and fifteen minutes passed between the time DeSanti telephoned Halbleib to tell him of Angelina's reported disappearance and the time Baker searched Myers' home. This was sufficient time to get a warrant. "[W]hile the opportunity to seek a warrant is not determinative . . . it is certainly relevant when exigent circumstances are pleaded. United States v. Duchi, 906 F.2d 1278, 1283 (8th Cir. 1990) (internal citation omitted).

The cases upon which Defendants rely to establish that there was an emergency are factually distinguishable from the case before me. United States v. Holloway, 290 F.3d 1331 (11th Cir. 2002), cert. denied, 537 U.S. 1161 (2003), involved a 911 call with a report of gunshots and arguing outside a private residence. Warrantless search of that residence was justified because it was reasonable for officers to believe there was an emergency that endangered human life. The court observed that "in an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger" and immediate action is necessary. Id. at 1338. In the case before me, there was no emergency. A vague threat by Dwayne made three to five days earlier and Angelina's mother's belief that she had been abducted and was in danger of physical harm are not equivalent to the gunshot reported in Holloway.

Radloff, 380 F.3d at 348, is similarly inapposite. There, officers went to a home after an unidentified caller reported that juveniles were consuming alcohol at that address. The Eighth Circuit found probable cause because it was reasonable for the officers to believe illegal activity was taking place since one officer observed a minor drinking alcohol.[5] Exigent circumstances existed "both because of the loud noise created by the party and because of the threat to public safety if the juveniles left the house in cars while under the influence of alcohol." Id. at 348. The court observed that it would have been unreasonable to obtain a warrant, as that would have subjected neighbors to loud noise and would have required the officers to quarantine the juveniles' cars while waiting for the warrant.

---

[5]Probable cause exists when it is reasonable to believe there is a fair probability that contraband or illegal activity will be found in a particular place. Kleinholz v. United States, 339 F.3d 674, 678 (8th Cir. 2003). The briefs of the parties do not address probable cause, and exigent circumstances must be accompanied by probable cause before a warrantless search is justified. United States v. Parris, supra. Because I find that the facts establish there were no exigent circumstances, I do not reach the question of probable cause.

Defendants assert that officers may search a home without a warrant when attempting to locate a missing person. The cases they rely upon do not support this broad proposition and are distinguishable on their facts. State v. Carlson, 548 N.W.2d 138 (Iowa 1996), involved specific and numerous facts indicating that a victim was in danger. In addition, there was no response to telephone calls to the home or knocks on the door by police, despite indications that the man with whom the victim lived was then present in the residence. There was also a history of domestic violence by that man. In Martin v. City of Oceanside, 360 F.3d 1078 (9th Cir.), cert. denied, 543 U.S. 817 (2004), officers were told that a woman was missing, her car was in her driveway, and although the neighbor believed the woman was home there was no response to knocks on the door or the telephone. In State v. Cecil, 311 S.E.2d 144 (W. Va. 1983), officers searched a mobile home for a missing child, acting upon information recently received from a father that his missing child was in that home.

I reject Defendants' assertion that Maryland v. Buie, 494 U.S. 325 (1990), justifies this search because it was cursory. Buie held that a warrantless, limited protective sweep of a home did not violate the Fourth Amendment when incident to the arrest of a suspect in that home. The search of Myers' home was not incident to arrest.

Finally, Defendants assert that United States v. Clayton, 210 F.3d 841 (8th Cir. 2000), indicates that the police needed only reason to believe that Dwayne was in his mother's home to enter it without a warrant. (Filing 55 at 12.) It does not. Clayton held that officers with a valid arrest warrant have authority to enter the home of the person named in the warrant in order to execute the warrant "so long as the police have a reasonable belief that the suspect resides at the place to be entered and that he is currently present in the dwelling." Id. at 843. In the case before me, Defendants had no warrant for Dwayne, and there was no reasonable believe Dwayne was present.

## III. CONCLUSION

There are material facts in dispute as to whether Myers' consent was voluntary. The undisputed material facts establish that there were no exigent circumstances. Thus, I will deny the cross-motions for summary judgment on the question whether the warrantless search was lawful because Myers consented, will grant Plaintiff's motion for summary judgment on the question whether exigent circumstances were present, and will deny Defendants' motion for summary judgment.

IT IS ORDERED:

1. Plaintiff's motion for summary judgment (filing 39) is granted on the question whether exigent circumstances were present and is otherwise denied;

2. Judgment for Plaintiff on the question of exigent circumstances will be withheld until final disposition of this case; and

3. Defendants' motion for summary judgment (filing 53) is denied.

May 25, 2007                    BY THE COURT:

                                *s/Richard G. Kopf*
                                United States District Judge